IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2002 Session

## MICHAEL EUGENE DUFF v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 61563     Mary Beth Leibowitz, Judge**

---

**No. E2000-03041-CCA-R3-PC**
**November 14, 2002**

---

The petitioner, Michael Eugene Duff, appeals the Knox County Criminal Court's denial of his petition for post-conviction relief from his convictions for two counts of aggravated rape and one count of aggravated kidnapping for which he received three twenty-five-year sentences to be served consecutively. This court affirmed the judgments of conviction on direct appeal. See State v. Michael Eugene Duff, No. 03C01-9501-CR-00008, Knox County (Tenn. Crim. App. Feb. 8, 1996), app. denied (Tenn. July 8, 1996). The petitioner claims that he received the ineffective assistance of counsel because his trial attorney (1) failed to call a DNA serologist to testify and (2) failed to present witnesses who could testify about his physical appearance at the time of the offenses. We conclude that the trial court's findings are insufficient for us to determine whether the petitioner received the ineffective assistance of counsel. We reverse the trial court's judgment and remand the case in order for the trial court to make findings of fact and conclusions of law consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed, Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Michael Eugene Duff.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court's opinion in the petitioner's appeal of his convictions recounts the following facts:

During the early morning hours of July 31, 1992, the victim in this case was driving on Oak Ridge Highway in Knox County on her way home. A car [traveling] behind her activated a blue emergency light. The victim assumed that the car behind her was a police officer [signaling] her to stop. Therefore, she pulled off to the side of the highway in front of Shucker's Restaurant. While she sat in her car waiting for who she thought was an officer of the law, the victim reached in her purse to produce her driver's license. As she was searching for her driver's license, the car door flew open and a man later identified as the appellant hit her in the face and pushed her in the floor. Someone else got into the passenger side of her car and held her down. The appellant drove the victim's car a short distance behind the closed restaurant where she had originally stopped her car. The victim struggled with her attackers and was eventually able to fight her way out of her car. She ran toward a hill behind the restaurant. Under a violent attack of nightmarish proportions, the victim had the presence of mind to dial "911" on the cellular phone which she had in her purse. She told the 911 dispatcher that three men were trying to rape or kill her. At approximately ten seconds into the emergency call, the appellant and the other attackers caught up with her, threw her down, and proceeded to rape her. The victim testified that the appellant got directly on top of her and inserted his penis inside her. Another one of the assailants also raped her while the defendant held her down. The victim testified that the twigs of a tree branch were placed in her vagina.

In response to the 911 call, officers of the Knoxville Police Department arrived on the scene and found the victim in the wooded area on top of an embankment behind the restaurant. The victim was taken to the emergency room where she was examined by Dr. Roger Millwood. Dr. Millwood removed the twigs from the victim's vagina and observed that the victim had suffered various scratches, bruises, and lacerations on her body. There was no vaginal bleeding. Although a rape kit was completed, Dr. Millwood saw no sperm on the swab that he obtained. The victim gave a description of one of her attackers to Officer Thomas Michael Presley, a criminal investigator with the Knoxville Police Department. Based on the description given by the victim, Officer Presley compiled a photo array and showed it to the victim on August 7, 1992, in his office. The appellant's picture was one of six shown to the victim at that time. The victim identified the appellant's photograph as being that of one of her attackers. The victim told Officer Presley that the appellant's photograph looked like the attacker in that his nose, face,

and eyes were the same. However, she said that her attacker's hair was shorter than that in the picture and that her attacker did not have a mustache. At that time she requested to hear his voice.

. . . .

Subsequently, the appellant was placed in a six (6) man lineup and the victim was called in to see if she could identify her attacker from the lineup. The victim requested to hear each man speak the words that one of her attackers had used during the rape. The appellant was standing in the number three position, and the victim identified him as being one of the men who raped her on July 31, 1992.

Michael Eugene Duff, slip op. at 2-5. At trial, the petitioner presented no proof, and the jury convicted him of two counts of aggravated rape and one count of aggravated kidnapping, Class A felonies.

At the evidentiary hearing, the petitioner's trial attorney testified that he was appointed to represent the petitioner. He acknowledged filing a motion for discovery and said the state gave him the results of the Federal Bureau of Investigation's (FBI) DNA analysis in the case. He said he filed a notice of alibi but decided not to pursue the defense when witnesses could not establish an alibi for the petitioner. He said he talked to the petitioner about the inability to establish an alibi. He said that although the victim tested positive for chlamydia after the rapes, he did not recall talking to the petitioner about having him tested for the disease.

The attorney acknowledged that the results of the DNA analysis showed that the DNA from the victim's vaginal swabs did not match the petitioner's DNA. He said he had planned to have the FBI's DNA serologist testify at trial about the results. He said that before trial, he talked to the serologist on the telephone and that the serologist sounded "very pro law enforcement." He said the serologist indicated that the lack of a DNA match did not disprove the petitioner's involvement in the rapes because the victim had stated that all three men raped her.

The attorney testified that after talking with the FBI serologist, he decided not to call him as a witness and to introduce the DNA results into evidence through the testimony of a Knoxville Police Department criminologist. He said that in a pretrial hearing, the state argued that the FBI's DNA report was hearsay. He said the trial court agreed with the state and offered to continue the case in order to give the defense time to arrange for the FBI serologist to testify. He said that he told the petitioner about his telephone conversation with the serologist and why he did not want the serologist to testify. He said he and the petitioner decided to forgo the continuance and proceed with trial. He said he decided to argue that the state did not have any DNA evidence linking the petitioner to the crimes.

-3-

The attorney testified that he did not remember the victim testifying that the petitioner was the only one inside of her. He acknowledged that he had serious concerns about the victim's identification of the petitioner because the victim's description of her attacker was inconsistent with the petitioner's appearance and because the victim had to hear the petitioner's voice in order to identify him. He said he did not recall whether he interviewed witnesses who could testify about the petitioner's appearance at the time of the offenses. He acknowledged that much of his trial strategy involved cross-examining the victim about her identification of the petitioner. When asked why he did not call any witnesses to testify about the petitioner's appearance, he said he was afraid they would open the door to evidence he was trying to keep from the jury.

The attorney testified that the petitioner was actively involved in the case and that the petitioner made the final decisions about trial strategy. He said that he advised the petitioner not to testify and that the petitioner decided not to take the stand. He said that after the trial, the petitioner regretted not testifying and not calling the FBI serologist as a witness.

On cross-examination, the attorney testified that he had been practicing law since 1986 and that ninety-five percent of his law practice involved criminal defense work. He said that at times, it was easy to get along with the petitioner and the petitioner was likeable. He said the petitioner was not overbearing and would listen to him. He said that when the trial court offered to give the petitioner a continuance, he discussed it with the petitioner and that the petitioner wanted to go forward with the trial. He said that the FBI serologist expressed no interest in helping the defense and that he thought the serologist would do anything to help the state's case. He acknowledged being afraid the serologist would tell the jury that the lack of a DNA match did not exculpate the petitioner. He said that after the trial court ruled the DNA results could only be introduced into evidence through the FBI serologist, he decided to argue to the jury that the state did not have DNA evidence in the case. He said he cross-examined the victim extensively about her identification of the petitioner. He said he also cross-examined Officer Presley about how the police got the victim to identify the petitioner as one of her attackers. He said he explained to the jury that it would have been difficult for all three men to have raped the victim in the short amount of time between her 9-1-1 telephone call and the arrival of the first police officer at the crime scene. He said that although he prepared the petitioner's case, the petitioner was involved in every part of the defense.

Leslie M. Jeffress, who was appointed to represent the petitioner for his direct appeal, testified that he spoke with the petitioner's trial attorney about the case. He said that although he thought the victim's description of her attackers was insufficient to identify the petitioner as one of them, he found no problems with the police's identification methods. On cross-examination, he acknowledged that he had always known the petitioner's trial attorney to be dedicated, conscientious, and prepared.

Marilyn Hamilton testified that she is the petitioner's aunt and used to style his hair. She said that in 1992, she saw the petitioner almost every day. She said that before and after the crimes, the petitioner had a mustache and the hair on the top of the his head was four or five inches long and curly. She said the petitioner always had a boxed haircut that was tapered on the sides. She said the

-4-

petitioner's trial attorney asked her to prepare evidence regarding the petitioner's appearance before and after the offenses. She said she brought several photographs of the petitioner to trial and planned to testify about his appearance. She said that during the trial, she had to wait outside the courtroom. She said that at some point, she looked through the glass in the courtroom doors and saw the petitioner's trial attorney giving a closing statement. She said the petitioner's trial attorney came out of the courtroom and told her that she did not need to testify. On cross-examination, Ms. Hamilton stated that she did not know what the petitioner's trial attorney said during trial because she was not in the courtroom. She also said she did not know where the petitioner was at the time of the crimes.

The petitioner testified that the FBI's DNA report was the best evidence for his case and that he told his attorney to use it in his defense. He said that after the jury had been selected, he kept asking his attorney if the jury was going to hear about the DNA evidence. He said his attorney told him, "Sure, sure." He stated that later, his attorney said he forgot to subpoena the FBI serologist to trial and asked the petitioner if the petitioner wanted a continuance. He said that although his attorney thought the serologist was going to lie for the state, he told his attorney to continue the trial anyway. He said his attorney assured him the jury would hear about the DNA results without the serologist's testimony. He said that after the victim testified the petitioner was the man who was inside of her the entire time, he talked to his trial attorney again about having the serologist testify.

The petitioner testified that he gave his attorney the names of four witnesses who could establish an alibi defense but that his attorney only talked to one of the witnesses and did not call any of them to testify. He said he also gave his attorney the names of witnesses who could testify about his appearance at the time of the crimes. He said his attorney did not want any of the witnesses to testify because his attorney thought the state would use them against the petitioner. Finally, he said that he gave his attorney the names of people who could testify about the victim's truthfulness but that his attorney never talked about calling them as witnesses. He said his attorney led him to believe that witnesses were going to testify in his defense. He said he did not learn until the last minute that his witnesses were not going to testify. He said that if he had known earlier that his attorney was not going to call any witnesses, he would have contested it.

On cross-examination, the petitioner acknowledged having five prior convictions, including convictions for robbery, forgery, and theft. He acknowledged that his attorney went to great lengths to ensure that he understood his right to testify. He said that although he learned during the pretrial suppression hearing that the defense would not be able to introduce the DNA report into evidence without the FBI serologist, his attorney assured him the jury would hear the evidence. He said he was unaware that his wife and sister had given the police two different alibis for him.

The trial court denied the petitioner's petition for post-conviction relief. The trial court found that although it offered to grant the petitioner a continuance in order to give him time to subpoena the FBI serologist, the petitioner decided to forgo a continuance and proceed with trial. The trial court found that the petitioner understood the FBI serologist would not testify. As to the trial attorney's failure to call witnesses to testify about the petitioner's appearance at the time of the crimes, the trial court stated that this issue was "one of the more difficult issues faced by the court."

Nevertheless, it found that the attorney's failure to call the witnesses was a strategic trial decision that was made due to the attorney's concern that the witnesses would open doors to evidence he was trying to keep from the jury. The trial court also stated that the attorney discussed the issue with the petitioner and that the decision not to call the witnesses was made with the petitioner "as opposed to willful failure to follow through with the issue."

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201. "However, if the record shows the action of trial counsel, in the circumstances shown, has no rational or logical basis, then the legitimacy of the tactics employed must be scrutinized under the requirement of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975)." State v. Buford, 666 S.W.2d 473, 475 (Tenn. Crim. App. 1983).

In a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. Tenn. Code Ann. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). We review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

## I. FBI SEROLOGIST

The petitioner claims that he received the ineffective assistance of counsel because his trial attorney failed to have the FBI serologist testify that the DNA from the victim's vaginal swabs did not match his DNA. He claims that this evidence became even more important to his defense when

the victim testified on cross-examination, "Michael Duff was the one that was on top of me, and was inside of me the whole time." He claims that after hearing this statement, his attorney should have asked for a continuance in order to get a DNA expert to testify. The state contends that the petitioner's attorney made a tactical decision not to call the serologist to testify and that the decision was understandable given that the serologist was going to downplay the DNA results. As to the petitioner's claim that the serologist's testimony became even more important once the victim testified that the petitioner was inside of her the entire time, the state contends that this does not support the petitioner's claim of ineffective assistance of counsel because the victim repeatedly testified that more than one man raped her. We believe that the petitioner has not demonstrated that he received the ineffective assistance of counsel.

Before trial, the state filed a motion asking the trial court to prohibit the defense from making references to the scientific evidence. In a pretrial hearing, the state explained to the trial court that the defense planned to question a Knoxville Police Department criminologist about the DNA results and that such testimony was hearsay. The following exchange then occurred:

> [Defense Attorney]: Judge, as a general rule, the State's test is exculpatory. Generally, getting the FBI down here for the defense takes about an act of congress, but if I need to get them down here, I will get them down here, and I will ask for a continuance, based on the State not giving me ten days notice on enhancement. I think I am entitled to that under the rules.
>
> [State]: Judge, he has had a year to get them down here. He knew who conducted this test.
>
> . . . .
>
> THE COURT: You better talk to Mr. Duff about this, please. Tell Mr. Duff the consequences of your motion–
>
> [Defense Attorney]: Sufficiently, Judge, I would submit that I can argue that they have no scientific proof without putting any proof on that they don't.
>
> [State]: Correct. We have no problem with that. No problem with that.
>
> . . . .
>
> THE COURT: Are you asking for a continuance or not?

[Defense Attorney]: Let me talk with Mr. Duff. If I need to get the FBI down here.

THE COURT: Let's get this issue, and you talk to Mr. Duff on it, and see what he says.

After a recess, the following exchange occurred:

THE COURT: All right. Please be seated. With regard to, ah, to the issue regarding scientific testing, ah, I think that we have kind of agreed, in the discussions that have gone back and forth between Mr. Duff and [his attorney], and the Attorney General, and myself, that [his attorney] may ask questions about what a particular individual did, such as the officer. If he wishes to seek scientific testing and evidence, I would allow him to have a fairly short continuance to do that. At this point you want to proceed?

[Defense Attorney]: No, Your Honor, assuming that we are, as you have ruled, that we can ask an officer what that officer done, or what any other individual, himself, done personally, we are prepared to go forward today. And we would agree, that anything else, asking what a particular results were, or what someone else done, would be inadmissible.

In light of the transcript of the pretrial hearing and the testimony at the post-conviction hearing, the evidence does not preponderate against the trial court's finding that the petitioner received the effective assistance of counsel. During the pretrial hearing, the trial court asked if the petitioner wanted a continuance, and the petitioner's trial attorney stated that he wanted to discuss a continuance with the petitioner. After a recess, the attorney told the trial court that "we are prepared to go forward today." At the post-conviction hearing, the petitioner's attorney testified that when he explained the continuance to the petitioner, the petitioner told him that he wanted to go forward with the trial. In addition, the petitioner acknowledged discussing a continuance with his attorney and knowing the serologist would not testify. The trial court obviously accredited the trial attorney's testimony that the petitioner made the decision to decline the trial court's offer for a continuance and proceed with trial. The petitioner has failed to demonstrate that he received the ineffective assistance of counsel.

We note that although the petitioner claims the FBI serologist's testimony became even more important to his case after the victim testified on cross-examination that he was the only man who penetrated her, our review of the trial transcript reveals that the victim testified on direct examination that in addition to the petitioner, at least one of the other three men inserted his penis into her vagina. Thus, we do not believe that the victim's statement necessarily contradicts the trial court's finding that the petitioner received the effective assistance of counsel.

## II. WITNESSES TO PETITIONER'S APPEARANCE

Next, the petitioner contends that he received the ineffective assistance of counsel because his trial attorney failed to have witnesses testify about his appearance immediately before and after the crimes in order to challenge the victim's identification of him as one of her attackers. The state claims the attorney's decision not to call the witnesses was a legitimate trial strategy that should not be second-guessed by this court. We conclude that we are unable to determine from the trial court's findings whether the petitioner received the ineffective assistance of counsel and remand the case to the trial court.

Initially, we note that the state presented no scientific evidence linking the petitioner to the crimes and that the petitioner's convictions depended on the victim's identification of him. As noted by this court in the petitioner's appeal of his convictions, when the victim identified the petitioner's photograph from a photograph array, she noted several differences in his appearance and her attacker's appearance. Specifically, she stated that her attacker's hair was shorter than the petitioner's hair and that her attacker did not have a mustache. It was only after she was able to hear the petitioner's voice that she became certain he was one of the men who raped her.

At trial, Officer Presley testified that the petitioner's photograph, which the victim identified from a photograph array on August 7, 1992, was taken in January 1992, six months before the crimes. He also stated that in the photograph, the petitioner had a mustache and that the mustache was similar to the one the petitioner had at trial. The police brought the petitioner to the police station for the physical lineup on August 25, 1992, nearly a month after the crimes. Officer Presley, who was present at both lineups, testified that the petitioner's hair on August 25 was shorter than it had been in the January 1992 photograph. There was no testimony concerning whether the petitioner had a mustache when he participated in the physical lineup on August 25. Obviously, the petitioner's appearance at the time of the crimes was a crucial issue in the case.

As previously mentioned, when analyzing this issue in its order denying post-conviction relief, the trial court found that the trial attorney discussed not calling the witnesses with the petitioner and that the two of them made the decision not to have the witnesses testify. We believe the evidence preponderates against this finding. When asked if he interviewed any witnesses who could testify at trial about the petitioner's appearance, the petitioner's attorney did not recall talking to any witnesses. Furthermore, when asked why he did not call any of the witnesses to testify, the attorney stated that <u>he</u> was afraid the witnesses would open the door to evidence he was trying to keep from the jury. Although the attorney testified generally that the petitioner made the final decisions about trial strategy, he did not testify that he had discussed this specific issue with the petitioner or that he and the petitioner decided not to call any witnesses. To the contrary, the petitioner testified that he did not learn until the last minute that his attorney was not going to call any witnesses. Ms. Hamilton's testimony that the attorney asked her to testify about the petitioner's appearance at the time of the crimes, that she brought photographs of the petitioner with her to the

trial, and that she had to wait outside the courtroom during the trial, would support the petitioner's testimony.

We see no rational basis for the attorney's decision not to call witnesses to testify about the petitioner's appearance at the time of the crimes. Although the petitioner's attorney testified that he was afraid the witnesses would open doors to evidence that he was trying to keep from the jury, we believe that with adequate preparation, the petitioner's trial attorney could have easily elicited testimony about the petitioner's appearance without revealing prejudicial information. We conclude that the trial attorney's decision was not a legitimate trial tactic.

Unfortunately, we are unable to assess the prejudicial impact of counsel's decision because the trial court gave no indication as to the credibility, or lack thereof, of Ms. Hamilton and rendered no findings or conclusions relative to the prejudice prong of the Strickland standard. Given the lack of sufficient findings, we reverse the trial court's order and remand the case to the trial court in order for it to make sufficient findings of fact and conclusions of law relative to the ineffective assistance of counsel.

_____
JOSEPH M. TIPTON, JUDGE